**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LANCE EDWARD FITZMAURICE,** | : | **Civil No. 1:10-CV-2262** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

In this case, Lance Edward Fitzmaurice, an inmate in the custody of the Federal Bureau of Prisons, has sued the United States of America pursuant to the Federal Tort Claims Act for injuries he claims to have incurred during an escorted medical trip when he fell while exiting a transport van wearing leg restraints. Fitzmaurice maintains that, although four federal officers accompanied him on this medical transport, none of these officers assisted him in trying to exit the transport van while clad in leg irons and manacles, and in fact had turned their backs to him as he endeavored to climb out of the vehicle, thereby allowing his feet to become entangled in his shackles, causing him to fall to the parking lot.

The Court previously denied the United States' motion to dismiss this action on the grounds that the discretionary function exception to the Federal Tort Claims Act barred the plaintiff's claims. (Doc. 36.) Following discovery, the United States has moved for summary judgment on the plaintiff's claim, once again arguing that the discretionary function exception to the FTCA bars this action and deprives the Court of jurisdiction over this matter. In support of its motion, the United States maintains that because the officers who escorted Fitzmaurice to an outside medical appointment were vested with discretion to determine how best to transport this inmate safely, Fitzmaurice cannot maintain a tort claim based on their alleged negligence. In addition, the United States contends that there is insufficient evidence to support Fitzmaurice's negligence claim. For the reasons that follow, we disagree, and the motion will be denied.

## II.   <u>BACKGROUND</u>

On October 19, 2009, during the time when he was incarcerated at USP-Canaan, in Waymart, Pennsylvania, Fitzmaurice was transported out of the institution for a non-emergency consultation with an outside medical provider. (Doc. 1, Compl., at 2.) According to Fitzmaurice, prior to departing USP-Canaan for the outside facility, he was placed in leg or ankle restrains, and handcuffs attached to a belly chain with a "black box" that further restricted the movement of his arms and hands.

(Id. at 2-3.) Fitzmaurice alleges that the officers responsible for transporting him to his appointment did not secure him with a seatbelt. (Id. at 3.) In what forms the basis for the claim in this case, Fitzmaurice alleges that when the transport team arrived at the outside medical facility, he was instructed to exit the van in which he had been riding. However, when he tried to do so, his ankle restrains became entangled and he fell forward onto the pavement. (Id. at 4.) Fitzmaurice claims that he suffered a variety of physical and emotional injuries as a result, although the United States has submitted evidence that it contends will show that Fitzmaurice's injuries were either minimal or nonexistent. In his tort claim, Fitzmaurice alleges that the escorting officers were negligent by failing to assist him when he was exiting the vehicle; failing to free the chain that had become entangled; failing to "assist [him] in falling forward"; and failing to break his fall. (Id. at 5.)

Fitzmaurice also alleges that the Director of the Federal Bureau of Prisons and the Warden of USP-Canaan breached their duty to "draft, implement or otherwise promulgate" standard operating procedures with respect to transporting inmates outside of the institution and moving inmates into and out of transportation vehicles; and that the breach of this duty caused his injuries. (Id. at 7-8.) In addition, Fitzmaurice claims that the Operations Lieutenant breached his duty to ensure that staff complied with standard operating procedures with respect to the placement of

inmates into vehicles and the subsequent removal of inmates from vehicles. (Id. at 11-12.)

In addition to these general claims of negligence, Fitzmaurice alleges that when he asked a transport officer for help scratching his nose, the officer replied by remarking that the pavement could scratch his nose. (Id. at 15.) Fitzmaurice also alleges that the escorting officers intentionally allowed him to fall from the vehicle, as they did not help him exit the vehicle, and failed to break his fall. (Id. at 15-18.)

Fitzmaurice pursued administrative remedies by filing an administrative tort claim for $50,000, among other requested relief. That claim was denied on April 29, 2010. (Id. at 30.) This litigation followed, with Fitzmaurice filing a complaint on November 2, 2010. (Doc. 1.)

After we denied the defendant's motion to dismiss, the parties engaged in discovery in the plaintiff's claims, which revealed additional information to that alleged in the complaint. Thus, the defendant has submitted a statement of undisputed facts supported by declarations from a number of BOP officers. This evidence indicates that C. Pawelski, a correctional officer at USP-Canaan, is a certified armed escort, which qualifies him to escort inmates on hospital or medical trips. (Doc. 68, Def. Statement of Undisputed Facts, ¶¶ 15-16; Ex. 1, Declaration of C. Pawelski ¶ 1.) This training covers the use of restraints and firearms. The United

States maintains, however, that this training is general in nature, and does not indicate whether officers should assist inmates in getting in or out of vehicles, and does not provide instructions for how officers should be positioned during escort trips. (Id.)

On October 19, 2009, Officer Pawelski was one of four officers assigned to escort Fitzmaurice to his medical appointment. (Id. ¶ 2.) During that transport, Officer Pawelski was assigned to the vehicle that follows the escort van, known as a chase vehicle. (Id.) When the team arrived at the medical facility, Officer Pawelski recalls that he positioned himself near the rear of the escort van, approximately 15 feet from the doors that open to allow the inmates to disembark. (Id. ¶ 3.) According to Officer Pawelski, the various circumstances of each escort trip will determine where he positions himself when he is armed, as he was during Fitzmaurice's transport. (Id.)

Officer Pawelski attested that he is unaware of any policy that would designate where he must be positioned during escorts, or that give specific direction as to how much physical help should be provided to inmates during the transport. (Id.) Officer Pawelski does not appear to recall many specifics about the transport in this case, though he recalls that Fitzmaurice existed the van as soon as the doors were opened, that his legs became entangled on the step of the van, that Fitzmaurice fell forward onto the parking lot. (Id.) Officer Pawelski does not recall that Fitzmaurice

requested assistance when he began exiting the vehicle, and he does not recall that any officer offered assistance at that point. (Id.) Following his fall, Officer Pawelski and Officer Eveland helped Fitzmaurice get to his feet. (Id.)

In terms of injuries sustained, Officer Pawelski does not remember that Fitzmaurice sustained any injuries, and he remembers that Fitzmaurice never mentioned his fall to the orthopedic doctor he was seeing him on October 19, 2009, for medical issues unrelated to the fall.[1] (Id.)

The United States has also offered a declaration from Andrew Edinger, M.D., a physician employed at a BOP Medical Officer assigned to USP-Lewisburg. (Doc. 68, Def. SMF, Ex. 2, Declaration of Andrew Edinger.) Dr. Edinger's declaration has been offered to provide evidence regarding Fitzmaurice's physical condition before and after he fell on October 19, 2009.

Although he is not a radiologist, Dr. Edinger has taken and interpreted x-rays throughout his career. (Id. ¶ 1.) As part of his duties, Dr. Edinger has access to inmate medical records, electronic data maintained on the BOP's SENTRY computer system, Administrative Remedy data, and BOP Program Statements. (Id.) Dr.

---

[1] Although Officer Pawelski attests that he was one of four transport officers assigned to Fitzmaurice's medical escort, the United States has not submitted declarations from any other officers who were present on October 19, 2009, and thus their activities and observations from that date have not been offered to the Court.

Edinger reviewed Fitzmaurice's electronic medical records in connection with this lawsuit, and attests that the file shows that Fitzmaurice had x-rays of his cervical spine taken in June 2006, due to complaints of numbness and tingling in his hands. (Id. ¶ 2 and Attach. A.) The x-rays taken at that time revealed a normal cervical spine. (Id.)

In February 2009, Fitzmaurice was again x-rayed, this time for complaints of bilateral knee pain. (Def. SMF ¶ 41; Ex. 2, Edinger Decl., ¶ 2, Attach. B.) The findings and conclusion of this x-ray was also negative. (Id.)

On April 10, 2009, Fitzmaurice underwent an MRI on his right knee which provided an impression that the inmate suffered from Chondromalacia patellae, a probable subtle tear of the anterior horn, lateral meniscus, and minimal knee joint effusion. (Def. SMF ¶ 43; Ex. 2, Edinger Decl., ¶ 2, Attach C.) On October 19, 2009, a report from the Magerman Jason Orthopaedic Institute – where Fitzmaurice was transported and fell – indicates "synovitis in the right knee; Chondromalacia patella right knee; meniscal tear right knee." (Def SMF ¶ 44, Ex. 2, Edinger Decl., ¶ 2, Attach. D.)

On the day he fell, Fitzmaurice was also seen in Health Services, complained of a sore left thumb, sore face, and a sore back from the fall. (Def. SMF ¶¶ 45-46, Ex. 2, Edinger Decl., ¶ 2, Attach. E.) The exam notes indicate that Fitzmaurice did

not present in pain or distress, but that he had superficial abrasions of the right cheek and elbow, mild swelling and redness in the left hand and thumb area, complaints of lower mid-back tenderness, and left posterior ankle superficial abrasion. (Id.) Aside from the foregoing, no other complaints were noted. (Id.) Two days later, on October 21, 2009, Fitzmaurice underwent x-rays of his pelvis area, left hand, cervical spine, and lumbar areas, all of which revealed either negative results or, in the case of the image of his cervical spine, "minimal anterolisthesis of C4-C-5." (Def. SMF ¶ 53, Ex. 2, Edinger Decl., ¶ 2, Attach. I.)

Fitzmaurice had additional medical images taken in September 2009 and April 2011, which showed no evidence that his right knee had a bone bruise or acute fracture, but that he had some degeneration, and images of his lumber and cervical spine areas revealed no injuries aside from mild degenerative disc disease. (Id., Attach. J, K, and L.) According to Dr. Edinger, there is no evidence that Fitzmaurice's already existing knee issues were aggravated by the October 19, 2009 fall, and the condition of Fitzmaurice's spinal column is normal for a man of his age. (Id.)

The United States has also offered evidence regarding the BOP vehicles that are used to transport inmates. This evidence indicates that BOP purchases vehicles from the General Services Administration (GSA) Autochoice program. (Def. SMF,

8

Ex. 3, Declaration of Don Aldrich, ¶ 1.) The vehicles purchased depend on agency need, cost, and availability. (Id.) Any modifications to a BOP vehicle are made at the Bus Center. (Id. ¶ 3.) No policies govern the modification of vehicles; instead, these changes are made based upon security and safety needs. (Id. ¶ 4.) Among other modifications, steps are added to prison transport vehicles specifically to allow inmates to enter and exit the vehicles safely while wearing leg restraints. (Id.) The steps are designed to be of a non-slip surface and a type of surface that will allow snow, sleet, rain, and other matter to sift through so as not to interfere with safe use of the steps. (Id.) The type of vehicle, the height of the undercarriage, and other factors of each vehicle are considered in determining where to place the steps, and how far from the ground the steps need to be to allow for road and curb clearance. (Id.) Another relevant factor to this determination is the length of the chain between a set of leg shackles. (Id.)

In addition to the foregoing, the United States has also offered evidence regarding the rules and regulations that govern escorted inmate trips. BOP Program Statement 5538.05, Escorted Trips, sets forth the general procedures for escorted trips. (Def. SMF ¶ 84; Ex. 4, Declaration of James Betler, Attach. 1.) Escorted medical trips are utilized in order to provide an inmate with medical treatment not available at the institution. (Def. SMF ¶ 85; Ex. 4, Betler Decl., Attach. A, at 2.) The

policy differentiates between emergency medical trips and non-emergency medical trips.  (Id.)

Non-emergency medical trips, such as the medical escort provided to Fitzmaurice on October 19, 2009, are pre-planned for purposes of providing inmates with medical treatment that is ordinarily not available at the institution.  (Id.)  The policy provides requirements regarding the supervision and restraint of inmates under medical escort.  (Def. SMF ¶ 90, Ex. 4, Betler Decl., Attach. A, BOP Program Statement 5538.05, at 8-14.)  The policy provides that the type of restraints to be applied to an inmate is determined after considering the purpose of the trip and the degree of supervision required by the inmate.  (Def. SMF ¶ 93, Ex. 4, Betler Decl., ¶ 4; Attach A., BOP Program Statement 5538.05, at 10-11.)  The number of staff assigned to the escort trip will depend on the inmate's custody level.  (Id.)

The program statement does not provide for how inmates are to be physically handled or whether they should be assisted with entering or exiting a vehicle.  (Def. SMF ¶ 97, Ex. 4, Betler Decl., Attach. A.)  Each institution is to develop Post Orders for Armed Escort Posts.[2]  (Def. SMF ¶ 98.)  These post orders are written generally

---

[2]  The United States had sought to include certain additional evidentiary exhibits as part of its motion for summary judgment, but sought to have these documents sealed from the public record and, indeed, from the plaintiff himself. Without revealing specifics, the document that was the subject of the motion (Doc. 64.) contains BOP policies and procedures regarding the transport of inmates, and

to address procedures for taking inmates out of the institution for scheduled escort trips or emergency escort trips. (Def. SMF ¶ 99.) The Special Post Orders for Escort Officers at USP-Canaan provides that escorting staff will remain with the inmate constantly throughout the trip. (Def. SMF ¶ 100, Ex. 4, Betler Decl. ¶ 5.) These orders also make clear that security is the priority throughout the trip. (Id.)

The number of staff assigned to an escort trip will depend on the custody classification of the inmate. (Def. SMF ¶ 103, Ex. 4, Betler Decl. ¶ 5.) Additional staff may be assigned at the discretion of the Warden. (Def. SMF ¶ 104, Ex. 4, Betler Decl. ¶ 5.) The restraints used on an inmate will depend on his custody classification. (Def. SMF ¶ 105, Ex. 4, Betler Decl. ¶ 5.) Other restraining equipment may be used at the discretion of the escorting officers. (Def. SMF ¶ 106, Ex. 4, Betler Decl. ¶ 5.)

Escorting staff are required to continually supervise the escorted inmate during a transport. (Def. SMF ¶ 107, Ex. 4, Betler Decl. ¶ 5.) The Special Post Orders do

---

it contains sensitive information. (Doc. 70.) Upon consideration, we found it neither necessary nor warranted to have the document placed under seal, and thus entered an order denying the motion to seal and having the document that had been provisionally sealed stricken from the record. (Doc. 70.) We further advised the parties that we would decline to rely on a document that would be withheld both from the public and the plaintiff in the course of adjudicating the motion for summary judgment currently before the Court. (Id.) By proceeding in this way, we endeavored to respect the defendant's concern about the sensitive nature of the information contained in the document, while at simultaneously safeguarding the interest of the plaintiff and the public in ensuring the transparency of the Court's adjudicative decisions.

not, however, provide specific instructions for how to physically handle or assist an inmate in getting out of or into the escort vehicle. (Def. SMF ¶ 108, Ex. 4, Betler Decl. ¶ 5.)

In a given year, the BOP transports approximately 50,000 inmates to outside medical facilities. (Def. SMF ¶ 109, Ex. 4, Betler Decl. ¶ 6.) Many aspects of these trips will be influenced by specific circumstances encountered during each trip, and policy permits escorting officers to exercise their judgment in determining how to accomplish each trip safely. Among the factors that escort officers may consider include, but are not limited to, whether the inmate requests assistance; whether the inmate is handicapped; the overall health of the inmate; personal knowledge of the inmate; observations of the inmate while on the escort trip; and other factors that may be unique to a given trip. (Def. SMF ¶ 115, Ex. 4, Betler Decl. ¶ 7.)

## III.   <u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Rule 56 provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Id.</u> "To be material, a fact

12

must have the potential to alter the outcome of the case" under governing law. N.A.A.C.P v. North Hudson Regional Fire & Rescue, 665 F.3d 464, 475 (3d Cir. 2011). In order for an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." In re Lemington Home for Aged, 659 F.3d 282, 290 (3d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986)).

The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this initial requirement is met, the burden then shifts to the non-moving party to demonstrate the existence of a genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460–61 (3d Cir. 1989). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the party opposing summary judgment and draws all reasonable interests in that party's favor. See Scott v. Harris, 550 U.S. 372, 378 (2007); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott, 550 U.S. at 380).

## IV.    DISCUSSION

### A.    The Federal Tort Claims Act and the Discretionary Function Exception

"The FTCA 'was designed primarily to remove the sovereign immunity of the United States from suits in tort, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances.'" Sosa v. Alvarez-Machain, 542 U.S. 692, 700 (2004) (quoting Richards v. United States, 369 U.S. 1, 6 (1962)); CNA v. United States, 535 F.3d 132, 138 (3d Cir. 2008).  Under the FTCA federal district courts have jurisdiction over civil actions against the United States for damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under the circumstance where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).  A person is permitted to sue under the FTCA to recover damages from the United States for personal injuries that he suffered during

confinement in a federal prison that resulted from the negligence of a government employee. See Rinaldi v. United States, No. 1:09-CV-1700, 2010 U.S. Dist. LEXIS 66024, at *11 (M.D. Pa. July 1, 2010) (Rambo, J.) (citing United States v. Muniz, 374 U.S. 150 (1963)). Notably, when Congress enacted the Federal Tort Claims Act, "[u]ppermost in the collective mind of Congress were the ordinary common-law torts." Dalehite v. United States, 346 U.S. 15, 28 (1953) (partially overruled on other grounds by Rayonier, Inc. v. United States, 352 U.S. 315 (1953). Thus, the Third Circuit has explained that:

> "[C]ongressional thought was centered on granting relief for the run-of-the-[mill] accidents," which occurred due to the Government's failure to take basic steps to alleviate specific safety concerns. In such a situation, the Government's conduct is analogous to that of a private citizen who fails to take appropriate action to ensure the safety of visitors on his or her property, and thus no broad public policy concerns are implicated.

S.R.P. ex rel. Abunabba v. United States 676 F.3d 329, 338-39 (3d Cir. 2012) (quoting Dalehite, 346 U.S. at 28 n.19).

The FTCA's waiver of sovereign immunity is tempered, however, by a number of statutory exemptions including a "discretionary function" exemption set forth in 28 U.S.C. § 2680(a), which provides that liability may not be premised on a claim against a government employee which is "... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty...".

In a federal prison setting:

> To determine if the discretionary function exception applies, a court must first determine if the challenged conduct involves an " 'element of judgment or choice.' " See Mitchell v. United States, 225 F.3d 361, 363 (3d Cir.2000) (citing United States v. Gaubert, 499 U.S. 315, 322-23 (1991) and Berkovitz v. United States, 486 U.S. 531, 536 (1988), and noting that there is no element of judgment or choice if " 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow' "). If the challenged conduct involves an element of judgment, a court must go on to consider " 'whether that judgment is of the kind that the discretionary function exception was designed to shield.' " Id.

Brown v. U.S. Justice Dep't, 271 F. App'x 142, 145 (3d Cir. 2008). See Koch v. United States, 814 F.Supp. 1221, 1227 (M.D. Pa. 1993). The discretionary function "exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals' United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808(1984)." Cestonaro v. United States, 211 F.3d 749, 753 (3d Cir.2000). As a jurisdictional boundary line, if an act falls within the discretionary function exception, then there has been no waiver of sovereign immunity as to that conduct and the court lacks subject matter jurisdiction to entertain a tort claim against the United States. See Cohen v. United States, 151 F.3d 1338, 1340 (11th Cir. 1998).

Thus, the Supreme Court has adopted a two-part inquiry with respect to whether the discretionary function exception set forth in 28 U.S.C. § 2680(a) applies. United States v. Gaubert, 499 U.S. 315, 322 (1991). Under this test, in order to fall under the discretionary function exception, the conduct must involve "an element of judgment or choice," and, second, "the judgment or choice must be based on consideration of public policy . . . ." Id. at 322-23; see also Mitchell v. United States, 225 F.3d 361, 363 (3d Cir. 2000). Indeed, "[b]ecause the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy . . . the exception protects only governmental actions and decisions based on considerations of public policy.'" S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 333 (3d Cir. 2012) (quoting Gaubert, 499 U.S. at 323). Whereas the plaintiff bears the burden of establishing that his claims come within the ambit of the FTCA's waiver of the federal government sovereign immunity, the United States has the burden of proving the applicability of the discretionary function exception. Id.

Before the Court undertakes this two-part inquiry, however, it is first necessary to "identify the conduct at issue." Merando v. United States, 517 F.3d 160, 165 (3d Cir. 2008). In this case, Fitzmaurice claims that the United States was negligent through, among other things, the failure of escort officers to assist him in exiting the

transport van while clad in leg irons and handcuffs, and otherwise for permitting him to fall and sustain injuries on October 19, 2009.

We have previously considered these issues in the context of the United States' initial motion to dismiss. In our earlier analysis, we found that the first step of the discretionary function exception was satisfied because there "is no specific statute, regulation or policy which mandates a specific course of action when handling prisoners in restraints who are entering or exiting a vehicle . . . ." (Doc. 32, at 12.) To the contrary, the applicable policy, BOP Program Statement 5538.05, Escorted Trips, sets forth general procedures for the transport of prisoners to medical facilities outside of the BOP institution.

The policy is set forth at 28 C.F.R. §§ 570.41, et seq. Section 570.44 addresses supervision and restraint requirements for inmates under escort. The policy requires the use of handcuffs and belly chains, but leaves to the discretion of the transport officers whether other restrain equipment is also appropriate. In addition, and relatedly, the decision of whether to use seat belts for inmates being escorted on outside medical trips is also committed to the transporting officers' discretion. See Vinzant v. United States, 458 F. App'x 329, 333 (5th Cir. 2012) (holding that the discretionary function exception applied to a decision of the U.S. Marshals not to secure prisoners seated in the rear of a van with seatbelts, in part, because requiring

Marshals to get close enough to inmates to buckle and unbuckle seatbelts triggered safety concerns). Likewise, there is no policy requiring officer to place their hands on an inmate who is existing a vehicle while the inmate is in hand and leg restraints, as in Fitzmaurice's case. Thus, we continue to find that the first step of the analysis reveals that there was no statute, regulation, or policy that prescribed a specific course of action for the transport officers to follow.

Moving to the second prong of the discretionary function exception, we must consider whether the judgment or choice of officers was based on "considerations of public policy." Gaubert, 499 U.S. at 323. The focus of this inquiry is "on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. at 325. The purpose of this test "is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and public policy through the medium of an action in tort." Id. at 322-23.

When we initially considered this prong, we concluded that the United States had failed to demonstrate that the element of judgment or choice displayed by the officers in this case was based upon considerations of public policy. (Doc. 36, at 5.) The defendants argue that following discovery, and with what they describe as a fully developed record, "it is clear that the decisions of the escorting officers were indeed susceptible to policy considerations and, therefore, the discretionary function

exception to the FTCA applies." (Doc. 69, at 8.) (original emphasis.) Thus, the government urges the Court to find that the discretionary function exception is triggered in this case not because the escort team actually made decisions that were committed to their discretion, and that these decisions were actually grounded in considerations of public policy; to the contrary, the government maintains that the exception should be found applicable because the decisions of the escorting officers were susceptible to policy considerations, and thus the exception applies in cases where, theoretically, officers could have exercised discretion even if there may be no evidence that they actually did so.

As a legal matter, we find the defendant's argument goes too far. In Gaubert, the United States Supreme Court observed that "[t]here are also discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." 499 U.S. at 325 n.7. Thus, the law does not provide that all discretionary acts of federal officers undertaken within the scope of their employment will be subject to the discretionary function exception.

In this regard, the United States Court of Appeals for the Second Circuit has persuasively noted, therefore, that "[i]t is not enough to establish that an activity is

not mandated by statute and involves some element of judgment or choice; to obtain

dismissal of the suit, the United States must also establish that the decision in

question was *grounded in considerations of public policy*." Coulthurst v. United

States, 214 F.3d 106, 110 (2d Cir. 2000) (emphasis added) (citing Gaubert, 499 U.S.

at 322-23, and Berkovitz v. United States, 486 U.S. 531, 536-37 (1988)). The Second

Circuit recognized the difficulty of applying the discretionary function in some cases

where the evidence does not indicate that discretion was actually exercised,

explaining as follows:

> We acknowledge that the text of [28 U.S.C. § 2680] is somewhat
> ambiguous, and conceivably could be interpreted to bar damage suits
> based on any actions or decisions that are not directly controlled by
> statute or regulation. In particular, it is unclear what weight to give to
> the concluding phrase of [§ 2680], which asserts that the exception is
> applicable "whether or not the discretion involved be abused." 28
> U.S.C. § 2680(a). Reading the words out of context, one might
> characterize an official's lazy or careless failure to perform his or her
> discretionary duties with due care as an "abuse of discretion." Reading
> the statute in this fashion, however, would lead to absurd results. For
> example, the driver of a mail truck undoubtedly exercises discretion in
> the manner of driving and makes innumerable judgment calls in the
> course of making his or her deliveries. In some manner of speaking,
> therefore, one might characterize it as an "abuse of discretion" for that
> driver to fail to step on the brake when a pedestrian steps in front of the
> car, to fail to signal before turning, or to drive 80 mile per hours in a 35
> mile per hour zone. Such a characterization, however, would effectively
> shield almost all government negligence from suit, because almost every
> act involves some modicum of discretion regarding the manner in which
> one carries it out. Such a result is not required by the language of the

[discretionary function exception] and would undercut the policy aims at the heart of the FTCA.

Id. at 110; see also Gaubert, 499 U.S. at 325 n.7.

Thus, although we recognize that the "touchstone of the second step of the discretionary function test is susceptibility to policy analysis," Cestonaro, 211 F.3d at 753, the Third Circuit has also read Gaubert to "underscore[] the importance of the relationship between the discretionary decision and policy considerations, [since] the exception applies only if the challenged actions can 'be said to be based on the purposes that the regulatory regime seeks to accomplish.'" Id. (quoting Gaubert, 499 U.S. at 325 n.7).

As part of our analysis, the United States urges the Court to follow the reasoning from a case decided by the United States District Court for the District of Oregon that involved a similar factual scenario to that presented in this case. In Crane v. USA, Civ. No. 3:CV-10-0068, 2011 WL 7277317, slip. op. (D. Or. Nov. 29, 2011) (Acosta, M.J.) (Rep & Recom.), adopted by 2012 WL 442748 (D. Or. Feb. 9, 2012), the plaintiff alleged that the Deputy United States Marshals failed to provide her with adequate assistance as she exited a transport van, and that as a consequence she fell and sustained injuries. Id. at *1. The plaintiff alleged that the officers who accompanied her on the transport were not near her as she exited the secure van. Id.

The plaintiff claimed that the external step of the van was approximately 15 inches above the ground, and that the distance prevented her from stepping all the way to the ground. Id. The plaintiff averred that her leg irons became stuck in the grating of the step, thus causing her to fall in a prone position. Id. Thereafter, the plaintiff alleged that the escorting officers came to her assistance. Id.

In considering the United States' motion to dismiss, the court observed that deputy marshals transport more than 17,000 inmates in a year, and frequently transported inmates who were shackled. Id. at *7. The court also noted that deputies received training in how to transport inmates, including those who are shackled, and were trained to consider whether the prisoner requested assistance, the prisoner's physical well-being, any known handicaps, and prior experience with the prisoner. Id. Additionally, in Crane the court noted that deputies also consider the surroundings to determine whether providing assistance might create safety or security concerns for themselves or the public. Id.

On the basis of these considerations, the court found that the failure of deputies to provide assistance that might have prevented the plaintiff's fall did not present a claim that was actionable under the FTCA. Id. at *8. The court thus found that the deputies had balanced their knowledge of the prisoner and the general risks that may attend unloading a shackled prisoner from a transport van, and determined that

physical assistance was unnecessary. Id. Thus, on this evidentiary showing, the court found that "the deputies' assessment of competing risks to prisoners, officers, and public safety is precisely the kind of decision meant to be shielded by the discretionary function exception," and granted the defendants' motion for summary judgment. Id.[3]

On the basis of this decision, and a number of other cases from outside of the Third Circuit in which courts have either presumed that a government agent's actions were grounded in policy when exercising discretion, even without considering whether the agent actually did weigh policy considerations, or where a plaintiff failed to allege any facts to show that the federal agent's decision was not grounded in policy considerations, (Doc. 69, at 12-13.), the United States now renews its request for summary judgment in this case.

Upon consideration, we continue to find that outstanding questions exist with respect to whether the discretionary function exception applies to the plaintiff's claims that the escort officers accompanying him to an outside medical appointment on October 19, 2009, were negligent. Although we recognize that the United States

---

[3] Although the district court granted summary judgment, the court also granted the plaintiff's motion for leave to amend her complaint to include a new allegation that the deputies were negligent in failing to warn her before she disembarked the van. 2012 WL 442748 at *2.

has offered competent evidence showing that BOP policies and procedures do not address how inmates are to be physically handled or whether they should be physically assisted with entering or exiting escort vehicles while clad in leg irons, and that escorting officers are not required by policy to put their hands on inmates as they exit vehicles, these facts standing alone do not compel judgment in the United States' favor. Although the defendant argues with force that the Court need only consider whether the escort officers' conduct was potentially susceptible to policy analysis, our reading of the case law suggests that at least in some cases such an analysis would be insufficient; indeed, to accept the United States' argument in this regard would essentially to allow the discretionary exception entirely to swallow the rule allowing a limited waiver of federal sovereign immunity to tort suits in all situations where a federal agent might conceivably have exercised some measure of discretion.

Furthermore, notwithstanding the evidence that the United States has offered, we observe that only one of the transport officers who accompanied Fitzmaurice to his medical appointment has submitted a declaration about his actions on the day of the accident. Thus, what these officers may have been doing during the time of the accident remains unclear, and although it is possible that these officers were engaged in conduct that was discretionary and related to policy considerations, we are unable to reach such a conclusion based on the evidence before the Court. We appreciate

that escort officers likely make myriad discretionary decisions during a typical prisoner transport exercise, but we cannot find, as the United States suggests, that the discretionary function exception necessarily insulates the United States from liability for virtually any decision that these officers make with respect to assisting inmates during escorts.

By way of example, we note that the United States District Court for the Northern District of Texas recently declined to dismiss an FTCA action brought by a 79 year-old inmate who fell down stairs from an airplane after deputy marshals failed to assist him, despite his age, infirmity, and the fact that he was fully restrained in handcuffs, shackles, and a belly chain. See McKinney v. United States, No. 4:12-CV-394, 2013 WL 2634431 (N.D. Tex. June 12, 2013). Thus , case law continues to acknowledge, a limitation on the discretionary function exception, which some courts refer to as the "negligent guard" theory of FTCA liability. Anson v. United States, No. 07-35A, 2008 WL 5869030 (W.D.N.Y. Nov. 5, 2008 ) Thus, where it is alleged that a prisoner plaintiff was injured as a result of "negligence unrelated to any plausible policy objectives," Coulthurst v. United States, 214 F.3d 106, 111 (2d. Cir. 2000), by prison officials, the United States may not rely upon the FTCA's discretionary function exemption to avoid civil liability.

As the United States Court of Appeals for the Third Circuit has observed in another factual context when interpreting the FTCA:

> The touchstone of the second step of the discretionary function test is susceptibility to policy analysis. See Gaubert, 499 U.S. at 325, 111 S.Ct. 1267 ("The focus of the inquiry is not the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."). As we have previously stated, a plaintiff's claim can only survive if "the challenged actions cannot 'be grounded in the policy of the regulatory regime.'" Gotha, 115 F.3d at 179 (quoting Gaubert, 499 U.S. at 325, 111 S.Ct. 1267).

> Cestonaro v. United States, 211 F.3d 749, 753 (3d Cir. 2000).

Thus when "the action or inaction goes more to the issue of negligence rather than whether the issue of policy discretion is implicated" the Government cannot avail itself of this discretionary function exception, Gotha v. United States, 115 F.3d 176, 180 (3d Cir.1997), and tort claims, including tort claims based on negligent transportation of prisoners, have been permitted to proceed. Anson v. United States, No. 07-35A, 2008 WL 5869030 (W.D.N.Y. Nov. 5, 2008 ).

In assessing whether this particular case falls within the discretionary function exemption, or is embraced within the "negligent guard" theory of liability, while we do not find the record compels a finding that officers blatantly disregarded their obligations to Fitzmaurice, we do conclude that there remain disputed questions with

respect to the officers' conduct and actions on the date of Fitzmaurice's accident. Specifically, with respect to the entire transport team, questions remain regarding whether the actions taken–or not taken–were a the product of a discretionary judgment shielded from liability, or simple negligence. These outstanding questions in this case cause us to find that summary judgment on the basis of the discretionary function exception is unwarranted.

### B. Questions of Fact Exist With Respect to Fitzmaurice's Negligence Claim

The United States also argues that it is entitled to summary judgment because Fitzmaurice has failed to come forward with sufficient evidence to support his negligence claim in this case. We disagree.

As noted above, the FTCA governs all claims against the United States "for money damages for injury or loss of personal property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2675(a). Additionally, under the FTCA, the United States will be liable "in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for . . . punitive damages." Id. at § 2674. The FTCA "provides a mechanism for bringing a state law tort action against the federal government in

federal court" and the "'extent of the United States' liability under the FTCA is generally determined by reference to state law." In re Orthopedic Bone Screw Product Liab. Litig., 264 F.3d 344, 362 (3d Cir. 2001) (quoting Molzof v. United States, 502 U.S. 301, 305 (1992)).

A federal district court considering an FTCA action must apply the law of the state in which the alleged tortious conduct occurred, which in this case is Pennsylvania. See 28 U.S.C. § 1346(b). Under Pennsylvania law, a plaintiff alleging negligence has the burden of proving the following elements by a preponderance of the evidence: (1) the existence of a legal duty on the part of the defendant; (2) a breach of that duty; (3) a causal relationship between the defendant's negligence and the plaintiff's injuries; and (4) resultant damages. City of Phila. v. Beretta U.S.A. Corp., 277 F.3d 415, 422 (3d Cir. 2002) (citing Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998)). "Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998). As the plaintiff, Fitzmaurice ultimately bears the burden of providing by a preponderance of the evidence that the United States' acts or omissions deviated from the general standard of care under the circumstances, and that the deviation proximately caused the harm. Id.

The United States argues that the record in this case will not support a negligence claim. In this regard, the United States points to evidence that it has submitted showing that the escorting officers positioned themselves in a manner in which they felt would best enable them to maintain security during the escort. The defendant also argues that Fitzmaurice did not mention the fall to the orthopedic doctor he saw on October 19, 2009, and any injuries that he did in fact sustain were very minor.

Fitzmaurice has not amassed considerable evidence in support of his brief in opposition to the motion, and, indeed, endeavors to argue that summary judgment is not warranted because he requires further discovery. (Doc. 75, at 5-8.) We are not persuaded that Fitzmaurice is entitled to reopen discovery, or that the United States' responses to the discovery requests that Fitzmaurice timely propounded were inadequate. Fitzmaurice never brought his discovery requests or disputes to the Court's attention during the discovery period, which has now been closed for some time.

Nevertheless, we do not agree that the record is entirely devoid of evidence in support of Fitzmaurice's negligence claim. Fitzmaurice has asserted that at least one of the escort officers in closest proximity to the van had his back turned to this inmate as he attempted to exit the van. The record also contains evidence that could indicate

that at the time of the incident, Fitzmaurice was being transported for a medical consult, and that he suffered from some array of medical ailments at that time, even if these may have only been a factor of age, and not all of them particularly serious. The record also indicates that Fitzmaurice was heavily shackled throughout this transport, and that he may have had some knee trouble or back pain, which may be relevant to considerations of whether the escorting officers should have been in a position to provide some measure of assistance to this inmate as he attempted to alight from a transport van while heavily shackled.

In consideration of these disputed facts, we do not find that summary judgment is warranted on the plaintiff's tort claims based on the record submitted by the United States. We, therefore, leave for another day the question of whether Fitzmaurice has provided sufficient evidence in support of his claims, and whether the record contains adequate evidence to support Fitzmaurice's suggestion that he suffered serious injuries as a result of his fall, or the related question of whether the scope of any potential damages in this case will be more than nominal.

## V.    __ORDER__

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED THAT the defendant's motion for summary judgment (Doc. 67.) is DENIED.

_/s/ Martin C. Carlson_

Martin C. Carlson
United States Magistrate Judge